# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ian H. Levin | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 8129 | **DATE** | 12/15/2000 |
| **CASE TITLE** | Kielczynski vs. Village of LaGrange | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter amended memorandum opinion and order of 11/5/00.**

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | 2 | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required. | | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | DEC 1 8 2000 | | 73 |
| | Notified counsel by telephone. | | | date docketed | | |
| | Docketing to mail notices. | | | docketing deputy initials | | |
| | Mail AO 450 form. | | | 12/15/2000 | | |
| | Copy to judge/magistrate judge. | | | date mailed notice | | |
| SM | courtroom deputy's initials | | FD-7 FILED FOR DOCKETING 00 DEC 15 PM 4: 47 | SM mailing deputy initials | | |
| | | | Date/time received in central Clerk's Office | | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| MARGE KIELCZYNSKI,<br><br>    Plaintiff,<br><br>v.<br><br>VILLAGE OF LAGRANGE, ILLINOIS<br>and LOREN CLARK,<br><br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) |

Case No. 97 C 8129

Magistrate Judge Ian H. Levin

**DOCKETED**

DEC 1 8 2000

## MEMORANDUM OPINION AND ORDER

Plaintiff Marge Kielczynski ("Kielczynski") seeks recovery in a three-count Second Amended Complaint against Defendants Village of LaGrange ("LaGrange") and Police Chief Loren Clark ("Clark") for gender discrimination and retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. §1983 ("§ 1983").[1] Pending is Defendants motion for summary judgment pursuant to Fed.R.Civ.P.56. For the reasons set forth below, the court denies Defendants' motion for summary judgment.

## PROCEDURAL HISTORY

In January, 1987, Kielczynski filed an Equal Employment Opportunity Commission ("EEOC") complaint alleging gender-based discrimination during her employment in appointments, promotions and assignments. (Defs.' Local Rule 12(M) Statement ¶ 11.)[2]

---

[1] The Village of LaGrange Board of Fire and Police Commissioners ("BFPC") is also joined solely as a Defendant necessary for complete relief. The Board thus is also a movant herein.

[2] The Northern District of Illinois has renamed Local Rule 12(M) Statement of Facts as Local Rule 56.1(a)(3)(A) and/or Local Rule 56.1(a)(3)(B). However, to avoid confusion Defendants' statement will be referred to as submitted, Defs.' Local Rule 12(M) Statement.

Subsequently, in March 1987, Kielczynski, filed a second EEOC complaint alleging gender-based discrimination during her employment in assignments, comments, evaluations, training and promotions. (*Id.* ¶ 12.) In June, 1989, Kielczynski, filed a third complaint alleging gender-based discrimination in training, promotions, assignments and retaliation. (*Id.* ¶ 13.) In October, 1996, Kielczynski filed a fourth EEOC complaint alleging gender-based discrimination in her employment, commencing in 1981. (*Id.* ¶ 14.) In May, 1997, Kielczynski, filed a fifth EEOC complaint alleging retaliation in connection with the Executive Management Program. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 81.)

On November 21, 1997, Kielczynski filed her original complaint in this action. (*See* Pl.'s Compl.) On May 4, 1998, this court granted leave for Kielczynski to file her Amended Complaint. Kielczynski's First Amended Complaint added Clark (in his official and/or individual capacity) as a defendant and added Counts III and IV. (*See* Pl.'s First Am. Compl.) Subsequently, Kielczynski was granted leave to file her Second Amended Complaint on October 28, 1999 alleging gender discrimination and retaliation. (*See* Pl.'s Second Am. Compl.)

The first two counts of Kielczynski's three-count Second Amended Complaint are brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* and allege that LaGrange discriminated against Kielczynski on the basis of her sex by deliberately downgrading her evaluations for promotion and thereby denying her promotional opportunities and other terms and conditions of employment (Count I) and retaliated against her for filing Charges of Discrimination with the EEOC (Count II). (*See* Pl.'s Second Am. Compl.) Count III is brought under 42 U.S.C. § 1983 and alleges sex discrimination and retaliation. (*Id.*) Counts I and II are brought only against LaGrange and Count III is brought against LaGrange and Clark, in

both his official and individual capacity. (*Id.*)

## BACKGROUND

In January, 1981, Kielczynski was appointed to the position of police officer with the LaGrange Police Department ("Department"). (Defs.' Local Rule 12(M) Statement ¶ 5.) Kielczynski was the first female police officer at LaGrange and she was hired to replace a male police officer. (*Id.* ¶ 7.)

Clark was hired as a rookie patrol officer by the Department in April, 1962. (*Id.* ¶ 8.) Clark was appointed acting Chief of Police in December, 1995, and was permanently appointed to that position in April, 1996. (*Id.* ¶ 9.)

In 1989, Officer (Ofc.) Renee Strasser (female officer), was hired as a rookie patrol officer with the Department. (Defs.' Local Rule12(M) Statement ¶ 107.) She is still employed with the Department. (*Id.*)

Kielczynski alleges that, during her police career with the Department, she has been subjected to numerous incidents of ongoing and continuing acts of sexual discrimination and retaliation, including: (1) refusing to provide necessary back up to protect Kielczynski in her work as a police officer, (2) failing to provide Kielczynski with necessary training to enable her to grow in her career, (3) reprimanding and disciplining Kielczynski more severely than male officers who engaged in the same or similar conduct, (4) reviewing Kielczynski's performance more critically than male officers were reviewed, and (5) taking actions to ensure that Kielczynski did not get promoted beyond patrol officer and was not able to advance in her career. (*See, generally,* Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J.)

Kielczynski alleges that the gender-based discriminatory acts began on her first day of

employment when former Chief Roy Lane told Kielczynski that he believed that women did not belong in law enforcement. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 3.) Furthermore, Kielczynski, alleges that early in her career, Department supervisors made many other discriminatory comments. (*Id.* ¶ 4.) For example, Lieutenant ("Lt.")Williams asked Kielczynski to clean the coffee pot because she had more experience. (*Id.*)

## I. Sex Discrimination[3]

### A. Sergeants' Processional Processes

#### 1. 1996 Process

Kielczynski was a candidate for promotion to sergeant in 1996. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 28.) In the 1996 promotional process, candidates for sergeant were ranked on the Sergeant's Eligibility Register on the basis of a numerical score. (*Id.* ¶ 29.) The score was again comprised of a written examination given by the BFPC, an oral interview given by the BFPC, and the Department Merit and Efficiency Ratings ("DMER") completed by LaGrange police supervisors, and seniority and military service points. (*Id.*) The written test, oral interview and DMER's each counted for 30% of a candidate's total score with a maximum five points added for seniority as well as additional points for military service. (*Id.*) The BFPC makes the determination regarding which candidate would be promoted from the eligibility list. (*Id.* ¶ 30.) Any one of the top three candidates may be selected for promotion to sergeant. (*Id.*) A promotion has never been given to an individual other than the top-rated individual on the sergeant's eligibility list. (Defs.' Resp. to Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 30.)

---

[3]As indicated in Kielczynski's Mem. in Opp'n to Defs.' Mot. for Summ J., Kielczynski intends to only seek liability as to those events that occurred beginning 300 days before Kielczynski's October 3, 1996 EEOC charge for purposes of Title VII and two years before the filing of her original complaint on November 21, 1997 for purposes of § 1983.

Prior to 1996, supervisory input was accorded less weight than the written examination scores and the oral interview scores in determining the final rankings of the candidates. (Defs.' Local Rule 12(M) Statement ¶22.) In addition, the Police Chief would typically elicit input from the other police supervisors as to each promotional candidate, but the Police Chief's own personal evaluation of each candidate carried greater weight than those of the other police supervisors. (*Id.* ¶ 26.) In 1996, Clark determined that the evaluations of each of the police supervisors, including sergeants, lieutenants, and the Police Chief, would be equally weighted as to each promotional candidate and that each supervisor should submit his written evaluations of the candidates confidentially to the BFPC. (*Id.* ¶ ¶ 27, 28.) The BFPC approved Clark's methodology for obtaining supervisory ratings as to each promotional candidate. (*Id.* ¶ 29.)

Kielczynski, who was the only female applicant for promotion to sergeant, submitted to the written promotional examination and an oral interview conducted by the BFPC. (Pl.s' Local Rule 56.1(b)(3)(B) Statement ¶ 32.) Kielczynski received the highest scores on the objective test and tied with one other candidate for the highest score on the oral interview. (*Id.* ¶ 34.)

Thereafter, the police supervisors, all males, including Clark, conducted individual evaluations of each sergeant candidate, including Kielczynski, for purposes of awarding merit and efficiency points. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ ¶ 39, 50.) According to Kielczynski, the supervisors deliberately awarded low merit and efficiency scores in order to keep her from being one of the top three candidates on the Sergeant's Eligibility Register. (Defs.' Local Rule 12(M) Statement ¶ 34.)

The supervisors at the time of the 1996 DMER ratings testified that Kielczynski had at times performed competently as a police officer. (Defs.' Local Rule 12(M) Statement ¶ 49.)

They, however, also believed that Kielczynski had manifested deficiencies of different types and severity in her performance as a police officer. (*Id.* ¶ 51.)

Kielczynski scored the lowest of all candidates on the DMER's. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 46.) Her overall score, which was an average of the scores she was given by nine raters, was 47 points. (*Id.*) (DMER's are comprised of ten components with each component being worth ten points. (*Id.* ¶ 44.)) Kielczynski overall ranked fourth out of seven candidates, behind three male candidates and ahead of two male candidates. (Defs.' Local Rule 12(M) Statement ¶ 34) The only candidate who was promoted from the 1996 Sergeant's Eligibility List was Sgt. Trzeciak. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 48.)

Kielczynski alleges that the low merit and efficiency scores are discriminatory because they are inconsistent and lacked uniformity. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶¶ 53, 63.) Kielczynski further contends that the police supervisors were unable to explain their basis for the ratings. (*Id.* ¶ 63.) Kielczynski also alleges that the scores she received varied more than the scores given to other candidates because she had a range of 63 points (highest score of 80 and lowest score of 17) which was the most inconsistent rating of any candidate. (*Id.* ¶ 54.)

## 2. 1999 Process

In 1999, Kielczynski, again, applied for promotion to sergeant. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 126.) Kielczynski scored the highest of all candidates on the written examination and on the oral interview. (*Id.* ¶ 129.) She, however, was ranked fifth out of nine candidates, behind three male candidates and one female candidate and ahead of four males. (Defs.' Local Rule 12(M) Statement ¶ 34.) Female Ofc. Strasser had also submitted to the promotional process and ranked second. (*Id.* ¶ 109.) Ofc. Strasser was appointed to sergeant by

the Department in November, 1999. (*Id.* ¶ 112.)

In 1999, Kielczynski was, again, rated the lowest on the DMER's of any candidate for sergeant. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 130.) Kielczynski, alleged, as she had in 1996, that the process was discriminatory because of the inconsistent and lack of uniformity among the merit and efficiency scores she received from the police supervisors. (*Id.* ¶ 132.) Kielczynski alleges that there were substantial variations in her scores and the police supervisors were unable to explain their ratings. (*Id.* ¶¶ 133, 135.) Furthermore, Kielczynski alleged that the 1999 DMER ratings given to her by Clark were not consistent with his statements regarding her performance since Clark had acknowledged that Kielczynski had improved since the 1993 sergeant's examination. (*Id.* ¶ 135.)

## B.    Special Assignments, Training, Discipline and Evaluations

In addition to her allegations of sex discrimination in the sergeants' promotional process, Kielczynski alleges that Defendants also discriminated against her with respect to special assignments, training opportunities, disciplinary measures and employee evaluations.

Kielczynski first contends that she has been discriminated against with respect to special assignments because, with the exception of Officer Schwaegerman, Kielczynski is the only officer who has been employed for at least four years and who has only had a minor, seasonal special assignment since the 1996 Sergeant's Eligibility Register was posted. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 209.) (Kielczynski was, however, a Squad Leader in 1993. (*Id.* ¶ 7.)) Kielczynski has only held the position of Bike Patrol Officer which is assigned during weekends or special events during warm weather months. (*Id.* ¶ 210.) Furthermore, every officer who has been promoted to the position of sergeant since 1993 was either an Investigator or Squad Leader

at the time of promotion, and has held both positions at some point in his or her career. (*Id.* ¶ 217.)

Kielczynski further contends that she has been discriminated against regarding training opportunities because she has regularly requested training and special assignments and she is the only officer who has not received any in-depth training, i.e., training of more than one day, since 1993. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶¶ 225, 227, 228.) From October 18, 1995 (300 days before Kielczynski filed her EEOC Charge) through October 30, 1998, the date of the training records produced by Defendants, Kielczynski received a total of 32 hours of training. (*Id.* ¶ 229.) Kielczynski alleges that, for the same period, the average number of training hours provided to male police officers (who were employed for four years or more) was 69.9 hours. Furthermore, Clark, as Police Chief, is responsible for approving all requests for officer training. (*Id.* ¶ 225.)

Kielczynski alleges that she has been discriminated against because she was disciplined for Department violations while male officers have either received lesser discipline or no discipline for similar offenses. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 85.) For example, Kielczynski was issued a letter of reprimand on June 9, 1997 (which was also reported on her two month and annual evaluation) by Lt. Neuzil indicating that she had failed to timely respond to a radio request to provide back-up to another Department police officer. (*Id.* ¶ 82.) Kielczynski also received an incident report on June 18, 1997 for failing to properly search a female prisoner. (*Id.* ¶ 88.) Kielczynski alleges that other male officers who did not respond to radio calls or who failed to conduct proper searches did not receive similar discipline.

Kielczynski further contends that male officers who exhibited inappropriate public

behavior either did not receive any discipline or received lesser discipline. (Pl.'s Local Rule 56.1(b)(B)(3) Statement ¶ 187.) For instance, Kielczynski received three incident reports and a letter of reprimand in response to complaints that she had displayed inappropriate public behavior. (*Id.* ¶ 162.) Another male officer, however, did not receive any discipline for inappropriate behavior, even though Clark was aware of the situation. (*Id.* ¶ 202.)

Kielczynski alleges that she has been discriminated against with respect to performance evaluations she has received from Department supervisors. In her evaluations, Kielczynski has received significantly lower ratings even though her evaluations have contained almost identical comments. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ ¶ 240, 241.) For example, a male officer whose productivity was lower than Kielczynski's was rated higher during two different rating periods. (*Id.* ¶ ¶ 243, 244.)

## II. Retaliatory Conduct

Kielczynski alleges that Defendants have retaliated against her through various adverse employment actions. (*See, generally,* Pl.s' Mem. in Opp'n to Defs.' Mot. for Summ. J.)

### A. Executive Management Program

In January, 1997, shortly after Kielczynski filed her October 3, 1996 complaint alleging gender discrimination, she informed Lt. Neuzil that she had been accepted into a program called the EMP which she intended to attend on her own time and at no expense to the Department. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 80.) Clark, subsequently, called the director of the program, Dr. Robert Fisher, and questioned why he would have allowed Kielczynski to participate in the program. (*Id.*) Ultimately, Dr. Fisher ended up rescinding Kielczynski's invitation to attend. (*Id.*)

Subsequently, on May 28, 1997, Kielczynski filed another EEOC complaint alleging retaliation in connection with the EMP. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 81.) Kielczynski, then, received a letter of reprimand on June 9, 1997, indicating that she had failed to timely respond to a radio request to provide back-up to another Department police officer and an incident report on June 9, 1997 for failing to properly search a female prisoner. (*Id.* ¶¶ 82, 88.)

### B.   1998/1999 Annual Evaluation

In September, 1999, Sgt. Trzeciak, who had been serving as acting shift supervisor for several months was responsible for the annual evaluations for his shift's personnel. Sgt. Trzeciak, Kielczynski's supervisor, rated her overall performance as "good" and/or "acceptable." Using an "A" to "D" scale (with "A" referring to conduct which was "exceptional" or "exceeded expectations") Sgt. Trzeciak rated Kielczynski as a "B" in 9 of 10 categories, similar to the rating which he had given other shift officers.

In her evaluation, Sgt. Trzeciak praised her for her productivity, cooperative attitude, and reliability. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 106.) The performance evaluation indicated, for example, that Kielczynski was one of the "busiest" and "most dependable and reliable" shift employees. Clark, subsequently, signed the evaluation of every member of the Department (including one he did not agree with), but he refused to sign Kielczynski's evaluation. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶¶ 108 -111.)

Clark, subsequently, reviewed Sgt. Trzeciak's evaluations and, ultimately, marked him down in the area of "Employee Monitoring and Evaluation." (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 122.) Clark stated in Sgt. Trzeciak's evaluation that he had been a poor evaluator throughout his supervisory career. (¶¶ 122-124.) As a result of his 1999 evaluation, Sgt.

Trzeciak received a lower merit pay increase than he had the previous year. (*Id.* ¶ 121.)

### C.   Investigation of Kielczynski's Neighbors

In July,1999, when Kielczynski's claims were being litigated, Department police officers questioned eight of the Kielczynski's neighbors about her off-duty conduct. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 100.) Specifically, a citizen had complained that Kielczynski had circulated a bulletin (issued by Cook County Sheriff's Police) that contained confidential information about a child who had been molested. (*Id.*) Clark directed the investigation and Kielczynski was exonerated because she had not distributed the flyer. (*Id.* ¶¶101 - 102.)

### D.   Other Retaliation

In addition, Kielczynski alleges that the Defendants retaliated against her when Clark rated her lower on the 1999 DMER's, than he had, in 1996, even though he stated that she had shown improvement and when she did not receive a Squad Leader or Investigator assignment in 1999. (Pl.'s Local Rule 56.1(b)(3)(B) ¶¶ 39-40, 150). Furthermore, she received three incident reports and a letter of reprimand on May 4, 2000, after Sgt. Trzeciak filed his April 27, 2000 EEOC complaint based on his own protected conduct in the lawsuit. (*Id.* ¶ 162.)

## LEGAL STANDARDS

### I.   Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party had produced evidence to show that it is

entitled to summary judgment, the party seeking to avoid such judgment must affirmatively demonstrate that a genuine issue of material fact remains for trial. *LINC v. Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 920 (7th Cir. 1997).

In deciding a motion for summary judgment, a court must "review the record in the light most favorable to the nonmoving party and to draw all reasonable inferences in that party's favor." *Vanasco v. National-Louis Univ.*, 137 F.3d 962, 964 (7th Cir. 1998). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Nevertheless, the nonmovant may not rest upon mere allegations, but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See also Linc*, 129 F.3d at 920. A genuine issue of material fact is not shown by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, 106 S.Ct. 2505 or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. This standard is applied with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. *See Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993).

"[S]ummary judgment is improper in a discrimination case where a material issue involves any weighing of conflicting indications of motive and intent." *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir. 1985), *citing, Kephart v. Inst. of Gas Tech.*, 630 F.2d 1217, 1218 (7th Cir. 1980). Finally, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,

whether he is ruling on a motion for summary judgment or for a directed verdict." *Freeman v. Madison Metro. Sch. Dist.*, 2000 WL 1640952, *3 (7th Cir. Nov. 2, 2000) (*quoting Anderson*, 477 U.S. at 255, 106 S.Ct. 2505).

## I.    Sex Discrimination

Under Title VII, it shall be unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). "The central question in any employment discrimination case is whether the employer would have taken the same action had the employee been of a different sex. . . . and everything else had remained the same." *Carson v. Bethlehem Corp.*, 82 F.3d 157, 158 (7th Cir. 1996) (per curiam).

To prevail in a sex discrimination suit brought under Title VII, a plaintiff must show that the defendant had an intent to discriminate; such a showing may be made through direct or circumstantial evidence, or indirectly, through use of an inferential burden-shifting method. *Kormoczy v. Secretary, United States Dep't of HUD*, 53 F.3d 821, 823-24 (7th Cir. 1995). The direct method requires that a plaintiff present either direct or circumstantial evidence of discriminatory intent. *Wallace v. SMC Pneumatics*, 103 F.3d 1394, 1397 (7th Cir. 1997).

In the absence of direct or circumstantial evidence to prove discriminatory intent, a plaintiff may show discriminatory intent indirectly using a burden-shifting method. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In order to use the burden-shifting method, a plaintiff must first establish a prima facie case of employment discrimination. *See Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1313 (7th Cir. 1989). Under the *McDonnell Douglas* framework, a plaintiff establishes a prima facie

case of employment discrimination by showing by a preponderance of evidence that: (1) he is a member of a protected class; (2) he was qualified for the job in question or was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action (e.g., termination); and (4) the employer treated similarly situated employees outside the protected class more favorably. *Foster v. Arthur Anderson, LLP*, 168 F.3d 1029, 1035 (7th Cir. 1999); *see Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 376 (7th Cir. 1998). More specifically, in the context of establishing a sex discrimination case in a failure-to-promote case, the plaintiff must show that (1) she is a member of a protected class; (2) she applied for and was qualified for the position sought; (3) she was rejected for the position; and (4) someone not in the protected class was given the position who had similar or lesser qualifications. *Perdomo v. Browner*, 67 F.3d 140, 144 (7th Cir. 1995).

If the plaintiff successfully makes the required prima facie showing, the defendant then has the burden of showing that the decision that was made regarding the plaintiff's employment, was not, in fact, gender-based. *McDonnell Douglas*, 411 U.S. at 802-03, 93 S.Ct. 1817. The defendant must then articulate a legitimate, non-discriminatory reason for its decision. *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 806 (7th Cir. 1999).

The burden then shifts back to the plaintiff "to present evidence that [the employer's] proffered reason is pretextual." *Vakharia*, 190 F.3d at 806-07. "Pretext . . . means a lie, specifically a phony reason for some action." *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 348 (7th Cir. 1997). The plaintiff need only "produce evidence from which a rational factfinder could infer that the [defendant] lied about its proffered reasons . . ." *Weisbrot v. Medical College of Wis.*, 79 F.3d 677, 682 (7th Cir. 1996). The following examples could be introduced as evidence

14

of pretext: "(1) the proffered reasons are factually baseless; (2) the proffered reasons were not the actual motivation for the [adverse decision]; or (3) the proffered reasons were insufficient to motivate the [adverse decision]." *Wolf v. Buss, Inc.*, 77 F.3d 914, 919 (7th Cir. 1996).

## II.    Retaliation

Title VII prohibits retaliation against an employee who has engaged in activity protected by the Act. 42 U.S.C. § 2000e-3(a). Section 2000e-3(a) states that "it shall be an unlawful employment practice for an employer to discriminate against any of its employees . . . because [they have] opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

A retaliation claim is subject to the same burden-shifting analysis. *Alexander v. Gerhardt Enter., Inc.*, 40 F.3d 187, 195 (7th Cir. 1994.) A plaintiff, however, must first establish a prima facie case of retaliation. To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *Jones v. General Electric Info. Serv.*, 3 F.Supp.2d 910, 918 (N.D. Ill. 1998).

A causal link may be established by showing that a plaintiff's discharge took place on the "heels of [the] protected activity" *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994) because suspicious timing constitutes circumstantial, or indirect, evidence to support a claim of discrimination. *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). Thus, a short time span between two events can be enough for plaintiff to create a triable issue as to the required causal link. *See Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 939 (7th Cir. 1996)

(finding that a reasonable inference on the causation issue arises when the adverse job action came two weeks after the filing of the EEOC complaint.) *See also Filipovic v. K&R Express Sys., Inc.*, 176 F.3d 390, 398 (7th Cir. 1999) (plaintiff could not establish a causal connection between the occurrence of the protected activity and adverse action because of a four month time lapse). Therefore, if there is a substantial lapse of time between a plaintiff's protected activity and a defendant's adverse action, the lapse of time is "counter-evidence of any causal connection." *Johnson v. Univ. of Wis.--Eau Claire*, 70 F.3d 469, 480 (7th Cir. 1995).

Some courts have, however, held that where there is a lack of temporal proximity, circumstantial evidence of a "pattern of antagonism" following the protected conduct can also give rise to inference of retaliation. *Kachmar v. Sungard Data Sys.*, 109 F.3d 173, 177 (3rd Cir. 1997). Furthermore, to establish a causal link, plaintiff must demonstrate that the defendant "would not have take the adverse action 'but for' the protected expression." *Adusumilli v. City of Chicago*, 164 F.3d 353, 363 (7th Cir. 1998).

## III.    42 U. S. C. § 1983

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privilege, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 28 U.S.C. §1983.

In a § 1983 claim against a municipality, a plaintiff must establish that he experienced a deprivation of a constitutional or federal statutory right and the deprivation was caused by

governmental officers acting in accord with municipal policy or custom. 28 U.S.C. § 1983;

*Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d

611 (1978). A plaintiff must identify a municipal "policy" or "custom" that caused the injury.

*See, e.g., Pembaur v.* Cincinnati, 475 U.S. 469, 480-81, 106 S.Ct. 1292, 89 L.Ed.2d 452. There

is case law which recognizes three ways in which a municipality's policy can violate an

individual's civil rights: "(1) an express policy that, when enforced, causes a constitutional

deprivation; (2) a widespread practice that, although not authorized by written law or express

municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the

force of law;' or (3) an allegation that the constitutional injury was caused by a person with 'final

policymaking authority.'" *Baxter by Baxter v. Vigo County School* Corp., 26 F.3d 728, 734-35.

(7th Cir. 1994) (citations omitted).

Once a policy or custom is established, a plaintiff must show a direct causal link between

that policy or custom and the alleged deprivation. *City of Canton, Ohio v. Harris*, 489 U.S. 378,

385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The evidence must show that the policy was the

moving force behind the constitutional violation. *Id.* at 379; *see Monell*, 436 U.S. at 694, 98

S.Ct. 2018. In other words, "[t]he municipality's policy must be the source of the

discrimination." *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995). A plaintiff must

demonstrate that a municipal decision reflects deliberate indifference to the risk that a

constitutional violation will follow the decision. *Board of County Commissioners of Bryan*

*County, Oklahoma v. Brown*, 520 U.S. 397, 411, 117 S.Ct. 1382; 137 L.Ed.2d 626 (1997).

Furthermore, "rigorous standards of culpability and causation must be applied to ensure that the

municipality is not held liable solely for the actions of its employees." *Id.* at 405.

For a plaintiff to prevail on a § 1983 equal protection claim against an individual, the plaintiff must establish that the defendant's discrimination was intentional. *Trautvetter v. Quick*, 916 F.2d 1140, 1150 (7th Cir. 1990). The individual must have caused or actively participated in the conduct which resulted in the deprivation. *Gossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1997); *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) (finding that an individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation.)

## ANALYSIS

### I. Sex Discrimination Claim

Under the *McDonnell Douglas* framework, Kielczynski essentially argues that for summary judgment purposes that she has established a prima facie case of sex discrimination, because, at the least, general issues of material fact exist that (1) she is a member of a protected class; (2) she was qualified for the job (i.e., promotion) in question (3) she suffered an adverse employment action (e.g., promotion denied); and (4) her employer treated similarly situated employees outside the protected class more favorably. For the reasons discussed below, the court agrees.

Initially, Kielczynski has successfully established her prima facie case for summary judgment purposes. For example, Kielczynski's evidence was that she, of course, is a woman, she sought a promotion to sergeant in 1996 and 1999, she was qualified for the positions as she made the eligibility list, she was, in fact, at the top in the written exams and oral interviews in both 1996 and 1999, she was not promoted when the 1996 and 1999 eligibility lists were in effect, and the men who ranked above her (1st ranked male in the 1996 process and 1st and 2nd

ranked males in the 1999 process) were promoted to sergeant. *See Dalton v. Village of Palatine*, 1997 U.S. Dist. LEXIS 5140 *8, (N.D.Ill. April 10, 1997).

Since the establishment of the prima facie case creates a rebuttable presumption of discrimination, the Defendants must now "produce a legitimate, non-discriminatory reason for its decision[s]." *Vakharia*, 190 F.3d at 806. If the Defendants make such a showing, the burden shifts back to Kielczynski "to present evidence that [Defendants'] proffered reason is pretextual." *Id.*

Kielczynski's threshold argument is that the 1996 and 1999 sergeants' promotional processes were discriminatory because the Department's supervisors deliberately awarded low merit and efficiency scores to keep her from being one of the top three candidates on the Sergeant's Eligibility Registers. (*See generally,* Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J.) Specifically, Kielczynski alleges that the supervisors scored her "inaccurately" or "too low" on the DMER's. (*Id.* at 4-5.) Defendants contend, however, that Kielczynski has provided no evidence that her scores were "inaccurate" or "too low," or that Kielczynski's gender played any role in any of the supervisors' assessments. (*Id.* at 6.)

Kielczynski asserts the following facts establish that the Defendants' discriminated against her: (1) Clark and Department supervisors explanations regarding how the rankings were determined lacked credibility; (2) the DMER's were inconsistent, highly subjective, not uniform and lacked safeguards to prevent discrimination; and (3) discriminatory attitudes about women and past discriminatory treatment towards Kielczynski. (*See generally,* Pl.'s Mot. In Opp'n to Summ. J.)

In the 1996 sergeants promotional process, Kielczynski scored the highest of all

candidates on the written examination and tied for the highest score on the oral interview (worth 60% of the overall examination score). (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶¶ 6, 34.) Kielczynski, however, ranked fourth out of seven candidates, behind three male candidates and ahead of two male candidates. (Defs.' Local Rule 12(M) Statement ¶ 34.) Sgt. Trzeciak, a male officer, was the only candidate promoted from the 1996 Sergeant's Eligibility List. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 48.)

In the 1999 promotional process, Kielczynski, again, scored the highest of all candidates on the written examination and on the oral interview (same criteria as 1996 examination.) (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 129.) She, however, was ranked fifth out of nine candidates, behind three male candidates and behind one female candidate and ahead of four males. (Defs.' Local Rule 12(M) Statement ¶ 34.) Ofc. James Joseph, who scored only 67 points on the written examination, less than what the testing company considers a passing score, was promoted from the list. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 146.)

In both the 1996 and 1999 processes, Kielczynski was rated the lowest of any of the candidates on the DMER's. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 130.) Kielczynski alleges that the low merit and efficiency scores she received are discriminatory because they are inconsistent, lack uniformity and the police supervisors were unable to explain their basis for the ratings. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶¶ 53, 63.) For example, Lt. Neuzil testified that he rated Kielczynski on how he felt about a candidate at the time he was completing the DMER's whereas Sgt. Lucas could not recall whether he based his 1996 ratings upon a candidate's entire career or whether he based it on a limited time period. (*Id.* ¶ 51.) Clark testified that he rated Kielczynski with a 0 in productivity, the lowest "Work Productivity" rating

he gave to any officer. (*Id.* ¶ 66.) "Work Productivity," however, is a category based on objective productivity which showed that Kielczynski was one of the most productive officers in the Department. (*Id.* ¶ 67.)

Kielczynski further alleged that the ratings given to her by Clark were not consistent with his statements regarding her performance. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 135.) For example, Clark testified that Kielczynski's performance had improved since the 1993 sergeant's examination; however, he rated her lower, in 1999, than he had in 1996. (*Id.* ¶¶140 - 144.) Clark also testified that Kielczynski's "Human Skills" had improved in 1999, but he still rated her with a 0 in that category. (*Id.* ¶ 141.) Furthermore, Clark testified that he has held the same opinion of Kielczynski since 1998, yet, in 1996, in the "Personal Integrity" category he rated her with a 7, but, in 1999, he rated her with a 0. (*Id.* ¶ 142.)

Kielczynski contends that her scores were discriminatory because they varied more than the scores given to other candidates. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 54.) For instance, Kielczynski received a total score of 17 from Sgt. Lucas and a total score of 80 from Sgt. Krebs indicating a range of 63 points. (*Id.*) Similarly, Kielczynski's scores on the individual components of the DMER were far more inconsistent than the ratings given other candidates. (*Id.* ¶ 55.) For example, Sgt. Noel rated her with an 8 in "Productivity" while Clark rated her with a 0. (*Id.*) Kielczynski received scores from the various supervisors that ranged 7.2 points apart from the highest to lowest rating. (*Id.*)

In defense of their merit and efficiency scoring process, Defendants assert that the Department supervisors did not believe that Kielczynski possessed the necessary attributes and qualities to perform satisfactorily as a supervisor. (Defs.' Local Rule 12(M) Statement ¶ 54.) The

police supervisors alleged that Kielczynski was unable to get along with other Department personnel, she was not a "team player," she emphasized "social programs" to the detriment of patrol duties, she lacked judgment in performing patrol duties, she failed to pass along law enforcement information, she lacked basic knowledge regarding patrol duties and she was incomplete in her report writing. (Defs.' Local Rule 12(M) Statement ¶ 51.)

Defendants also contend that the DMER's are not gender-based because in 1999 there was another female sergeant candidate, Ofc. Strasser. (Defs.' Reply in Supp. of Mot. for Summ. J. at 3.) Ofc. Strasser ranked second on the 1999 Sergeant's Eligibility List and was promoted to sergeant. (*Id.*) On the 1999, DMER's, every supervisor ranked Ofc. Strasser higher than Kielczynski, including Sgt. Trzeciak who is Kielczynski's primary supervisory support. (*Id.*) Five of the seven supervisors, including Sgt. Trzeciak, ranked Ofc. Strasser either first or second among the candidates. (*Id.* at 5.) None of the supervisors, including Sgt. Trzeciak, ranked Kielczynski among the top three candidates. (*Id.*)

In further defense of its rating process, Defendants assert that Kielczynski's DMER scores reflect more consistency than alleged by Kielczynski. (Defs. Reply Mem. in Supp. of Mot. for Summ. J. at 3.) For example, in 1996, the supervisors ranked Kielczynski in the bottom half of the promotional candidates. (*Id.* at 3.) Defendants do admit, however, that even though Kielczynski was ranked low, that in the past two years, she has improved as a patrol officer and has unquestionably performed well in certain areas of her position (i.e., as a COP Officer).[4]

---

[4]In 1993, Kielczynski volunteered to participate in a program called Community Oriented Policing ("COP"). (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 10.) The goal of the COP Unit was to establish trust between the Department and community and use the trust to solve community problems. (*Id.* ¶ 14.) Kielczynski was highly successful in her role as COP Officer and received numerous awards for her work. (*Id.* ¶ 23.)

Because the Defendants claims, particularly, the one asserting that Kielczynski does not possess the qualifications to perform as a sergeant, are sufficient to satisfy their burden of producing legitimate, nondiscriminatory reasons for its decisions, the burden now shifts back to Kielczynski to present evidence that the Defendants' proffered reasons are a pretext for discrimination. To show pretext, Kielczynski need only produce evidence from which a rational factfinder could infer that the Defendants' lied about its proffered reasons and they were not the true motivation behind the decision not to promote Kielczynski. *See Weisbrot*, 79 F.3d at 682.

With respect to the issue of pretext, Kielczynski cites *Dalton* as being similar to the case at bar. *Dalton*, 1997 U.S. Dist. LEXIS 5140. In *Dalton*, a female candidate for sergeant scored the highest on the objective written examination, but based upon the oral portion of the process, was ultimately ranked sixth on the eligibility list and the five men above her were all promoted to sergeant. The court found that defendants nondiscriminatory explanation for their failure to promote was pretextual, and denied the defendants' motion for summary judgment relating to sex discrimination in promotion. (*Id.*, at *13.)

In finding pretext, the *Dalton* court relied upon the fact that Dalton obtained the highest score on the objective part of the examination but wound up on the bottom half of the list, noting that " . . . a reasonable fact-finder could think it is suspect when a person does so exceedingly well on the written portion of the exam, which is worth half the overall score, that she does not fall at least in the top half of the list." *Id.*, at *10. Furthermore, "[c]onsidering the lack of uniformity in scoring the candidates on the oral components of the exam and the unlikely placement of candidates on the eligibility list, . . . a rational fact-finder, considering the totality of

the circumstances, could infer that the defendants' proffered reasons were untrue." *Id.*, at *13. Furthermore, the court found that, although the use of subjective factors alone did not give rise to an inference of pretext, "the lack of safeguard and checks and balances to prevent discrimination when using a subjective testing criteria" was relevant to the pretext inquiry. *Id.*, at *14-15.

This court finds that Kielczynski has presented evidence from which a rational factfinder could infer that Defendants proffered reasons are not true and may be a pretext for discrimination. For example, Defendants contention that Kielczynski did not possess the necessary attributes and qualities to perform satisfactorily as a supervisor are not supported by the evidence because she received the highest score of all candidates on the written and oral examinations in both 1996 and 1999; next, Defendants allegation that Kielczynski's merit and efficiency scores were actually consistent because the supervisors ranked her in the bottom half of candidates is misconstrued because the evidence shows that the Department supervisors ranked her inconsistently among the DMER components and had varying explanations for their basis for the ratings; moreover, Clark's ratings of Kielczynski were not consistent with his statements regarding her performance.[5]

This court finds that the DMER portions of the 1996 and 1999 sergeants' promotional processes were highly subjective. In *Dalton*, the court considered that the fact that the use of subjective factors alone did not give rise to an inference of pretext. *Dalton*, 1997 U.S. Dist. LEXIS 5140, *14. However, it is understood that subjective practices are particularly susceptible

---

[5]Furthermore, given the case record here, the fact that Sgt. Strasser was promoted to sergeant in 1999 cannot be determinative as a matter of law as to whether or not Kielczynski has been a victim of sex discrimination in the sergeants' promotion processes and other conditions of her employment during the period in question herein.

to discriminatory abuse and should be closely scrutinized. *E.E.O.C. v. Sears, Roebuck & Co.*, 839 F.2d 302, 331-32 (7th Cir. 1988). The lack of safeguards and checks and balances to prevent discrimination when using a subjective testing criteria can be indicative of discrimination. *Davis v. Weidner*, 59 6 F.2d 726, 732 (7th Cir. 1979). While a subjective portion to the sergeants' promotion process is relevant to the testing process, the lack of uniformity and inconsistency in scoring indicates a lack of safeguards in the subjective portion of the examination and is relevant to a pretext of discrimination.

In summary, upon a complete review and applying applicable summary judgment standards, this court finds that when viewing the evidence in this fact intensive case in the light most favorable to Kielczynski, that a fair-minded jury clearly could return a verdict for her on the evidence presented as it relates to her sex discrimination claims.[6] Therefore, this court finds that there is sufficient evidence to create a genuine issue of material fact regarding Kielczynski's sex discrimination claims.

## II.    Retaliation Claims

In order for Kielczynski to establish a prima facie case of retaliation, she must show that (1) she was engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse actions. *Jones*, 3 F.Supp at 918. Once Kielczynski has established her prima facie case, the *McDonnell Douglas* burden-shifting analysis applies. *Alexander*, 40 F.3d at 195. The Defendants do not raise any issues related to the above recited first two prongs of the prima facie case. Accordingly, the court here addresses the causal link issue raised by the Defendant.

---

[6]The court also finds that genuine issues of material fact exist as to the portions of the sex discrimination claims relating to special assignments, training, discipline and evaluations.

**Regarding the causal link issue:**

In January, 1997, shortly after Kielczynski filed her October 3, 1996 EEOC complaint, she informed Lt. Neuzil that she had been accepted into the EMP which she planned to attend on her own and at no expense to the Department. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 80.) Kielczynski alleges that in retaliation of her having filed the complaint, the Defendants (i.e., Clark) contacted the EMP Director, Dr. Robert Fisher, and had her invitation to attend the program withdrawn. (*Id.*) Furthermore, Village Manager Marlies Perthel, who had supported Kielczynski's application to the program before she filed her EEOC complaint disavowed any involvement with Kielczynski and together with Clark falsely implied that she had gotten into the program through deceit and collusion. (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. at 13.)

Defendants claim that Kielczynski was mistakenly issued an invitation to the EMP and that the invitation was withdrawn as soon as the mistake was recognized. (Defs.' Reply Mem. in Supp. of Mot. for Summ. J. at 10.) The issuance of the invitation was based upon Dr. Fisher's misunderstanding that Kielczynski was about to be appointed Chief of Police. (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 12.) When Dr. Fisher became aware of the true facts, he made the decision that Kielczynski was not an appropriate EMP candidate. (*Id.*) Defendants claim that Clark's only action was to accurately tell Dr. Fisher that Kielczynski was a patrol officer and she was neither the Chief of Police, nor imminently to be appointed to Chief of Police. (Defs.' Reply Mem. in Supp. of Mot. for Summ. J. at 10.)

Based in part on her withdrawal from the EMP, on May 28, 1997, Kielczynski filed a second charge of retaliation alleging retaliation in connection with the EMP program. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 81.) The charge named specific supervisors; including, among others, Lt. Neuzil, in connection with allegations of retaliation. (*Id.*)

Shortly thereafter, on June 9, 1997, Kielczynski was issued a letter of reprimand (which was also reported on her two month and annual evaluation) by Lt. Neuzil indicating that she had failed to timely respond to a radio request to provide back-up to another LaGrange police officer. (Local Rule 56.1(b)(3)(B) Statement ¶ 82.) Kielczynski informed her supervisors that she did not know that Ofc. Strasser required assistance, that she had not heard or understood the radio traffic and that once she understood that help was needed, she did respond. (*Id.*)

Kielczynski stated that other employees who have failed to respond to calls or have misunderstood them have either received no discipline or lesser discipline than a letter of reprimand. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 85.) For example, Kielczynski complained that she herself had received late assistance on a radio call. (*Id.* ¶ 83.) Kielczynski alleges that her supervisor's explanation for not responding earlier to Kielczynski's radio call for assistance was the same as the explanation Kielczynski gave for the above referenced incident for which she received an incident report. (*Id.* ¶ 83.) Another officer, on numerous occasions between November 1996 and August 1998, failed to respond to radio calls, but received only an incident report or no discipline at all. (*Id.* ¶ 87.) Defendants state that the incidents Kielczynski cites are not similar to her situation because Kielczynski failed to obey a verbal face-to-face order directed to her. (Defs.' Resp. to Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 85.) Furthermore, Kielczynski's incident involved a situation where she was to respond to an "officer requiring assistance"and that none of the other cited incidents involved potential or actual danger to the individual. (*Id.* ¶ 87.)

On June 18, 1997, Kielczynski received an incident report for failing to properly search a female prisoner. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 88.) Seven to eight hours after Kielczynski had placed the prisoner in the cell, an officer found her wearing earrings, rings and a

pair of glasses. (*Id.* ¶ 88.) The prisoner's rings could not be removed and because Kielczynski thought the glasses were eyeglasses as opposed to sunglasses, she allowed the prisoner to keep them. (*Id.* ¶ 88.) Kielczynski is aware of the fact that allowing a prisoner to wear earrings violates department policy. (Defs.' Local Rule 12(M) Statement ¶ 58(b).) Kielczynski, however, contends that one male officer was not disciplined for failing to locate drugs during a prisoner search and on another occasion someone had failed to detect a knife that had been carried into a prisoner's cell. (*Id.* ¶ 58(a).) Furthermore, another officer was not given any type of discipline for failing to check a prisoner after placing him in a cell. (Pl.'s Local Rule 56.1(b)(3)(B) Statement ¶ 94.) Defendants allege that the incidents that Kielczynski cites are dissimilar and do not involve similar circumstances to Kielczynski's incident. (Defs. Resp. to Pl.'s Local Rule 56.1(b)(3)(B) Statement 94.)

In the case at bar, Kielczynski has established that there is a casual link between the protected activity and the adverse actions (she was subjected to adverse actions after the filing of her October 3, 1996 and May 28, 1997 EEOC complaints). In addition, there was not a substantial lapse of time between Kielczynski's protected activities and the adverse actions taken by the Defendants. In particular, the retaliatory actions following the May 28, 1997 EEOC complaint took place "on the heels of the protected activity" because Kielczynski received a letter of reprimand on June 9, 1997 and an incident report on June 18, 1997, respectively. *See Dey*, 28 F.3d at 1458.

With respect to the allegation of retaliation regarding the EMP, this court finds that Defendants have satisfied their burden of producing a legitimate, nondiscriminatory reason for its actions. The burden now shifts back to Kielczynski to present evidence that the Defendants' proffered reasons are a pretext for discrimination. This court finds that Kielczynski has

28

established a genuine issue of material fact as to the question of pretext. For example, a reasonable inference can be made that Clark sought to revoke Kielczynski's invitation to the EMP in retaliation of her having filed an October 3, 1996 EEOC complaint. While Defendants allege that Clark's only purpose in calling Dr. Fisher was to provide him with the correct information regarding Kielczynski's status as a police officer, a trier of fact could infer that Clark's proffered reason is untrue and not the real motivation for his actions. *See Weisbrot*, 79 F.3d at 682. Furthermore, the fact that Kielczynski received a letter of reprimand (June 9, 1997) and an incident report (June 18, 1997) after she filed a second EEOC (May 28, 1997) complaint in response to the EMP adds to the inference of discrimination.

With respect to Kielczynski's allegation of retaliation of unequal treatment regarding disciplinary practices, this court finds that the Defendants have satisfied their burden of producing a legitimate, nondiscriminatory reason for its actions. It is plausible that the specific incidents whereby Kielczynski received discipline, including her failure to properly search a prisoner and failing to respond to calls are so patently different from the actions of other male patrol officers that she would warrant a stricter type of discipline. However, at the same time, a legitimate inference of pretext is raised when, as Kielczynski's evidence infers, similarly situated employees receive different disciplinary actions for what appears, in most instances, to be similar types of Department violations. *See Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 770 (7th Cir. 1994) (holding that one means of demonstrating pretext is to put forth evidence that employees outside the protected class who were involved in misconduct or comparable seriousness were not subject to similar adverse employment action.)

In short, this court finds that when viewing the evidence in the light most favorable to Kielczynski, that a fair-minded jury could return a verdict for her on the evidence presented as it

relates to her retaliation claims.[7] Therefore, this court finds that there is sufficient evidence to create a genuine issue of material fact regarding Kielczynski's retaliation claims.

## III.    Section 1983 Claims

In Count III of Kielczynski's Second Amended Complaint, she alleges sex discrimination and retaliation against Defendants LaGrange and Clark pursuant to 42 U.S.C. § 1983.

### A.    Claim Against LaGrange

In her § 1983 claim against LaGrange, Kielczynski must establish that she experienced a deprivation of a constitutional or federal statutory right, and the deprivation was caused by governmental officials acting in accord with municipal policy or custom. 28 U.S.C. § 1983; *Monell*, 436 U.S. at 694, 98 S.Ct. 2018. In the case at bar, Kielczynski has alleged and this court finds, for the reasons heretofore stated, that there is a genuine issue of material fact regarding her sex discrimination and retaliation right deprivation claims. *See, e.g., Trautvetter*, 916 F.2d at 1150. Kielczynski must next establish the existence of a municipal policy. *See Pembaur*, 475 U.S. at 480-81, 106 S.Ct. 1292.

Kielczynski contends that LaGrange has liability as to Kielczynski's § 1983 claim because LaGrange's sex discrimination and retaliatory practices stem from municipal policy. (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. at 21.) A municipal policy can be, for example, an express policy that, when enforced, causes a constitutional deprivation; a widespread practice that, although not authorized by written law or express municipal policy, is so permanent

---

[7]In addition, this court finds that when viewing the totality of Kielczynski's retaliation claims (i.e., her 1998/1999 annual evaluation, the investigation of her neighbors, Clark's 1999 DMER ratings, her not receiving a Squad Leader or Investigator position in 1999, her letters of reprimand and her incident reports) a legitimate inference can be drawn that the Defendants have engaged in a "pattern of antagonism" towards Kielczynski. *See Kachmar*, 109 F.3d at 177.

and well settled as to constitute "custom or usage" with the force of law; or it can be an

allegation that the constitutional injury was caused by a person with final policymaking authority.

*McTigue*, 60 F.3d at 382.

In the case at bar, Kielczynski's evidence is that LaGrange has an express policy

governing the promotion of police officers under which DMERs are 30% of the final score.

(Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. at 21.) Kielczynski argues that the DMERs

were used to block her promotion even though she scored well on the written and oral

examinations. (*Id.*) Kielczynski maintains that she was unable to receive a promotion because

of the discriminatory and retaliatory motives of her supervisors. (*Id.*) Kielczynski points out that

there is no system for checking on the consistency or accuracy of the DMERs. (*Id.*) Therefore,

Kielczynski alleges that LaGrange has an express policy giving rise to municipal liability,

because when enforced, it causes a constitutional deprivation. (*Id.*)

In addition, Kielczynski maintains that LaGrange has liability to the remainder of her §

1983 claims because Clark, who was the moving force, is LaGrange's policymaker. (Pl.'s Mem.

in Opp'n to Defs.' Mot. for Summ. J. at 21.) Therefore, for example, LaGrange is liable for

Kielczynski's claims relating to the denial of training and assignments, discipline and

evaluations, and the acts of retaliation that ensued after she filed her lawsuit. (*Id.*)

Kielczynski argues that Clark, as LaGrange's policymaker, is responsible for helping to

make policy with respect to the Department. (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J.

at 21.) Kielczynski points out that Clark has authority over disciplinary actions that do not

involve suspensions greater than five days. (*Id.*) Clark is in charge of LaGrange's Equal

Employment Opportunity (EEO) policies as they relate to the Department. (*Id.*) Clark is

responsible for administering the DMERs and making determinations regarding assignments, and

trainings. (*Id.*) In addition, Clark is responsible for the LaGrange's retaliation policy. (*Id.*)

This court finds that genuine issues of material fact exist as to Kielczynski's § 1983 claim against LaGrange. Initially, Kielczynski's above discussed retaliation evidence, following Kielczynski's taking of legal action, supports the claim of deprivation of a federally protected right(s) under § 1983. The court further finds that the evidence of record, as exemplified above, creates genuine issues of material fact as to the existence both as to the requisite municipal policy or custom and, alternatively, whether constitutional injury was caused by a person (i.e., Chief Clark) with final policymaking authority who was the motivating force behind the deprivation of rights.

### B.    Claim Against Clark

For Kielczynski to prevail on her § 1983 claim against Clark, individually, she must establish that Clark's intent to discriminate against her was based upon gender. *See Trautvetter*, 916 F.2d at 1150. Furthermore, Clark must have caused or actively participated in the conduct which resulted in the deprivation. *See Gossmeyer*, 128 F.3d at 495.

Kielczynski alleges that Clark sought to discriminate against her based on gender and actively participated in discriminatory conduct to achieve that end. (Pl.s' Mem. in Opp'n to Defs.' Mot. for Summ. J. at 22.) For example, it can be reasonably inferred from Kielczynski's evidence that Clark administered the DMERs, instigated discipline and makes decisions regarding special assignments and trainings. (*Id.*) A reasonable inference from Kielczynski's evidence also is that Clark is the moving force in the sex discrimination and retaliation claims that she asserts. (*Id.*)

Defendants contend that Clark neither administer the DMER's nor instigated discipline. (Defs. Reply Mem. in Supp. of Mot. for Summ. J. at 13.) Defendants claim that it is undisputed

that each individual supervisor completed his own DMER's. (*Id.*) In addition, each of the disciplinary actions complained of by Kielczynski was issued by someone other than Clark. (*Id.*) Furthermore, Clark's role with the EMP was simply to convey accurate information to Dr. Fisher, the program director, to correct his own misunderstanding and withdraw the invitation. (*Id.*)

The court finds that Kielczynski has presented evidence creating a genuine issue of material fact as to the requisite intentional discrimination by Chief Clark.

Clark also claims that he is entitled to qualified immunity from suit on the § 1983 claims of sex discrimination and retaliation. (Defs.' Mem. in Supp. of Mot. for Summ. J. at 15.) He alleges that there is nothing in the evidence to suggest that he did or said anything that would violate Kielczynski's rights. (*Id.*) As discussed, *supra*, this allegation is unavailing for purposes of summary judgment.

With respect to the law, under the doctrine of qualified immunity, public officials performing discretionary functions are protected against suits for damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). When state of mind is an issue, the Seventh Circuit has held that courts are not to consider intent when making the final determination at summary judgment of whether the law is clearly established. *Auriemma v. Rice*, 910 F.2d 1449, 1453 (7th Cir. 1990). The qualified immunity analysis entails a purely objective inquiry to determine whether at the time of the alleged illegal act, the right asserted by the plaintiff was clearly established in the particular factual context. *Id.* at 1452-55.

This court finds that there is no question that the acts of sex discrimination and retaliation

Kielczynski argues Clark engaged in would be illegal. As the court stated in *Dalton*, "[h]ere, the question is whether it was clearly established that defendants were prohibited from conducting the sergeant promotional process to effectuate gender discrimination. There is no question that the law in 1994 was clear that discrimination on the basis of sex in employment is illegal." *Dalton*, 1997 U.S. Dist. LEXIS 5140, * 20.

This court finds that there is a genuine issue of material fact(s) regarding Kielczynski's §1983 claim against Clark, as well as Clark's claim of qualified immunity.

## CONCLUSION

In view of the foregoing, the court finds that a fair-minded jury could render a verdict for Kielczynski. Therefore, Defendants LaGrange and Clark's motion for summary judgment is denied.

ENTER:

IAN H. LEVIN
**United States Magistrate Judge**

Dated: November 15, 2000